UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
                                                             :

SANDRA WALKER,                          :     **MEMORANDUM**
                                                             :     **DECISIONAND ORDER**
                                  Plaintiff,            :
                                                             :     14 Civ. 1396 (BMC)
                        - against -         :

COCA-COLA REFRESHMENTS USA, INC.,  :

                                  Defendant.     :
-----------------------------------------------------------X

**COGAN**, District Judge.

       The commencement of an action for employment discrimination does not give the plaintiff a blank check to engage in misconduct on the job while the action is pending. Where, as here, the plaintiff has an extensive record of employment misconduct prior to commencing the action, additional misconduct after the commencement of the action is not protected from the disciplinary sanctions that the employer would normally impose. It is not "retaliation" when an employer, faced with new allegations of employee misconduct after commencement of litigation, investigates and acts upon those allegations in the same manner it would have absent the litigation. Rather, it is appropriate human resources management. An employee's commencement of a lawsuit cannot put her in a privileged disciplinary position compared to an employee who has not commenced litigation.

       This is an action for retaliation in which plaintiff complains that she was terminated as a result of having brought a prior suit, <u>Alvarez v. Coca-Cola Refreshments, U.S.A.</u>, No. 12 Civ. 234 (E.D.N.Y.), since dismissed, alleging racial discrimination. The issues here are informed by an approximately 150-page arbitration decision in which the arbitrator found good cause for

plaintiff's termination under the collective bargaining agreement between plaintiff's Union and employer. Plaintiff presented the same retaliation claim in the arbitration that she raises here.

At the time of her termination in 2012, plaintiff had an atrocious disciplinary file dating back to 2006 that included two Final Written Warnings. Plaintiff, of course, disputes most of the incidents contained in her disciplinary file, but she pursued grievances on none of them until her termination. The straw that broke the camel's back, resulting in plaintiff's termination in conjunction with her problematic disciplinary history, was an incident involving a co-worker, which was reported to the employer and witnessed by several other co-workers. The central issue in this case is whether a reasonable jury could find that the co-worker complaint leading to plaintiff's termination (when considered along with her prior disciplinary history and that she was under a Final Written Warning) was incited or seized upon by the employer as a pretext to retaliate against her for having brought her first action. Like the arbitrator, I hold that any such finding would be patently unreasonable on this record, and a jury verdict so finding would have to be set aside. I therefore grant defendant's motion for summary judgment.

## BACKGROUND

At the outset, I note that I am not going to get into the weeds of the numerous incidents involving plaintiff and her co-workers to an extent anywhere near that of both parties in their motion papers. This is not an arbitration or mediation hearing, and the particular question of who was right or wrong as to each incident is immaterial. It is clear from the record that the warehouse floor, at least when plaintiff was on it, was like a high school locker room, full of bullying, immature insults, and petty vindictiveness. But I am looking for evidence upon which a jury could reasonably find retaliatory termination, not childishness.

2

Plaintiff began working for defendant in 1998 at defendant's Maspeth, Queens warehouse. In 2001, she was promoted to Production Associate. Her disciplinary problems began in 2006. Virtually all of her problems involved fellow Production Associates, sometimes when they were temporarily elevated to the title of "Working Foreman," which title included the responsibility to give plaintiff directions. On various other occasions, her problems involved supervisors as well.

The incidents involving plaintiff and her co-workers continued through December 2010, when she took a worker's compensation leave of absence for just under one year. As I found in my decision dismissing plaintiff's underlying racial discrimination claims, it is not disputed that her conduct included, among other things, starting and spreading an entirely fictional rumor among other employees that an Operations Manager that she did not like was having sex with a Production Associate. She went so far with this story as to present the Human Resources department with sexually graphic photos and texts, falsely attributing them to this Production Associate. She also left the Operations Manager an extremely offensive voicemail message. Both the Operations Manager and the Production Associate provided defendant with their phone records, which showed that the two had never exchanged the explicit texts pictures plaintiff accused them of sending. Plaintiff refused to provide her phone records. It soon became clear that plaintiff concocted the whole thing, and that she knew so at the time she reported it to defendant. In addition, plaintiff called another manager a "racist S.O.B.".

For all of this conduct, she received a Final Written Warning on October 21, 2010, shortly before she went on leave. (She may have also been suspended in connection with this Final Written Warning, but the record is not clear.) The Final Written Warning stated, as they generally do, that any further violation of company policy would result in termination. In

connection with the Final Written Warning, plaintiff was provided with copies of the written policies governing employee conduct.

This Final Written Warning, as suggested above, was not the first disciplinary sanction imposed on plaintiff. It was not even her first Final Written Warning. She had her first Final Written Warning in mid-2006 for insubordination towards a supervisor. Defendant follows the "progressive discipline" system commonly used at large unionized companies, which typically starts with informal counseling and/or a verbal warning, then a written warning, then a final written warning, and if that is violated, a termination review, which can result in suspension or termination. Plaintiff went through all of these steps for different incidents before defendant issued the 2010 Final Written Warning. Defendant's internal investigation leading to the 2010 Final Written Warning showed that plaintiff was not getting along with a number of her fellow employees. The complaints, from co-workers of many different races and national origins, were severe. Plaintiff's Union initially grieved the 2010 Final Written Warning, but the grievance was withdrawn.

About one month after plaintiff returned from leave, she and 15 of her co-employees filed the Alvarez action, alleging claims of racial discrimination and hostile work environment. In the instant case, plaintiff asserts that the filing of Alvarez is the protected activity for which she was terminated. I granted summary judgment in Alvarez, dismissing plaintiff's claims, on November 3, 2014.

The commencement of the Alvarez case had two immediate effects. First, it caused both plaintiff's Union, Teamsters Local 812, and of course defendant, to undertake an investigation into its allegations. These inquiries, especially those of her Union, caused a number of plaintiff's co-employees to come out of the woodwork and complain about her conduct. At the same time,

the complaint identified a number of allegedly discriminatory or racially hostile incidents that did not directly involve the Alvarez plaintiffs, but involved other co-workers identified in the Alvarez complaint, mostly as part of its hostile work environment claims, in which some of those co-workers were described as witnesses to or victims of the alleged hostile work environment. A number of these non-plaintiff employees gave statements to the Union and/or defendant contradicting or asserting mischaracterizations of the incidents attributed to them in the Alvarez complaint.

The culminating event that defendant asserts caused plaintiff's termination allegedly occurred on May 16, 2012, about five months after the commencement of Alvarez. A co-employee, Samuel Pimentel, who plaintiff had unsuccessfully importuned to join Alvarez, complained to both the Union and defendant that plaintiff had blocked him from going through a narrow hallway or entering a restroom and balled up her fists in a menacing manner. He thought she might hit him. Several employees who had witnessed the incident supported his view that plaintiff gave all appearances of intending violence against Pimentel, although they said she ultimately did allow him to pass without violence.

When plaintiff was interviewed by defendant on several occasions following the commencement of Alvarez regarding the Pimentel incident and other difficulties between her and the other employees, she surreptitiously recorded the interviews. This was a significant tactical mistake by plaintiff because, when the transcripts of these interviews were produced during discovery in this case, they showed that while defendant's managers acted in a perfectly responsible manner in trying to find out her position on what had occurred, plaintiff was belligerent, defensive, abusive, and indeed made an additional threat against Pimentel. In one interview, when asked whether she had ever secretly recorded her co-workers (an ironic

5

question, considering that she was surreptitiously recording that very interview), she stated repeatedly, "I plead the fifth." She told the interviewer, "I'm not going to answer any more questions pertaining to anything that might incriminate myself . . . You know we have amendments in this country?" She exploded when asked about the Pimentel incident, vehemently denying any such altercation, and threatening,

> And if Sammy pushes the issue about me and having a beef, he's going to have a bigger problem. He's going to have a bigger problem because then I have to go in my bag of tricks and start saying things which I know I should have put in a nice safe spot for him.

Defendant's investigation concluded that, especially considering that plaintiff had been issued a Final Written Warning, there was good cause to terminate her for violating numerous written company policies, principally its "Conduct in the Workplace Policy," which prohibits "[t]hreatening, intimidating or harassing another employee." She had been provided with copies of all of these policies when defendant issued its Final Written Warning to her in 2010. Defendant terminated her employment on June 29, 2012.

Plaintiff's Union grieved the termination at her request and the matter went before Arbitrator Robert Herzog, Esq., a very experienced labor arbitrator. Plaintiff's lawyer in the instant case attempted to appear as counsel to plaintiff in the arbitration, but when the Arbitrator pointed out that the arbitration was only between the Union and defendant, plaintiff's lawyer appeared as co-counsel to the Union. The Union's position was that plaintiff had not engaged in misconduct, and that defendant had induced the employees to come forward and condemn plaintiff in order to manufacture an excuse for her termination. Alternatively, the Union argued that even if plaintiff had engaged in the alleged misconduct, termination was too severe a sanction.

The arbitration proceedings were extensive. The Arbitrator heard testimony from thirteen witnesses, all of whom appear to have been called by defendant. Plaintiff apparently did not testify. Without, again, getting into the details of every incident involving plaintiff to which these witnesses testified, each of the witnesses (save one, who was clearly intimidated and contradicted prior statements he had made to defendant concerning plaintiff) testified to specific incidents of harassment, bullying, and intimidation. A number of plaintiff's co-workers and immediate supervisors (of several races and national origins) considered her a shirker, a liar, a bully, a character assassin, and someone taken to vulgarities and ethnic slurs.

A recurrent theme for many of the incidents was that plaintiff had become vindictive towards them when they rejected her efforts to persuade them to join the Alvarez lawsuit; several testified to being threatened by her "close friend" (and possibly boyfriend), a 250-pound truck driver for defendant, for not "backing my girl up." Each of the witnesses vehemently denied that defendant had induced or incited them to complain about plaintiff and testified that they had come forward of their own volition because of their distaste for working alongside her. Several said they had come forward voluntarily to complain to the Union or defendant about plaintiff after reading the Alvarez complaint because it described conduct or actions involving them that were not true or which the complaint mischaracterized.

Arbitrator Herzog rendered an extensive decision, most of which described in detail the testimony of each witness. However, although he ruled definitively against plaintiff, he did soon relatively narrow grounds. He chose (similar to the choice I have made in describing plaintiff's disciplinary history) to put aside the many incidents of alleged misconduct, and focused instead on the Pimentel incident and plaintiff's subsequent threat when the company investigator asked her about it. He found that the Pimentel incident had happened the way all of the witnesses had

7

described it and that plaintiff's self-generated secret recording constituted yet another threat against Pimentel. He very bluntly held that in light of plaintiff being under a Final Written Warning, and having an extensive disciplinary file of infractions that had not been grieved, the Pimentel incident alone was sufficient cause for termination. He noted that "[s]tale discipline often is not accorded much weight in disciplinary cases. One tenet exception is when a consistent pattern has been ongoing." After setting forth a chart listing plaintiff's disciplinary history since 2006, he held:

> The events of May 16, 2012 [the Pimentel incident] were the catalytic actions which advanced Grievant Walker's discharge. Three (3) separate witnesses testified that Grievant Walker committed threatening, intimidating, aggressive, and harassing actions in the narrow hallway outside the women's locker room. All three (3) witnesses testified to her threatening facial expressions, intimidating and aggressive clenched fists, and harassment by partially blocking the passageway . . . The unrefuted May 16, 2012 confrontation was immediately reported to the Company, timely investigated, and discipline issued.
>
> In the final analysis, Grievant Walker was placed on Final Written Warning Status. When issued the Final Written Warning, Grievant Walker was provided with copies of the Company Equal Opportunity, Harassment, Sexual Harassment, and Retaliation Policy, the Company Workplace Violence Prevention Policy, and the Company Conduct in the Workplace Policy. These documents clearly placed Grievant Walker on notice as to what unacceptable conduct would violate the Final Written Warning and result in her termination. Within six (6) months of work after being issued the Final Written Warning [that is, excluding the period during which she was on leave], Grievant Walker committed prohibitive acts which triggered her termination. Grievant Walker has no one but herself to blame for ending her employment with the Company.

(Emphasis deleted).

## DISCUSSION

I evaluate a Title VII retaliation claim under the three-step, burden-shifting framework as adapted from <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 93 S. Ct. 1817 (1973). First, a plaintiff must establish a *prima facie* case of retaliation by demonstrating that (1) "he engaged in protected participation or opposition under Title VII . . . (2) that the employer was aware of this activity, (3) that the employer took adverse action against the plaintiff, and (4) that a causal

8

connection exists between the protected activity and the adverse action, i.e., that a retaliatory motive played a part in the adverse employment action." Kessler v. Westchester Cnty. Dep't of Social Servs., 461 F.3d 199, 205-06 (2d Cir. 2006) (citations omitted). In determining whether a plaintiff has satisfied this initial burden, the court's role in evaluating a summary judgment motion is "to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive." Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 173 (2d Cir. 2005). For that reason, at the *prima facie* stage, a plaintiff's burden is "*de minimis*." Treglia v. Town of Manlius, 313 F.3d 713, 721 (2d Cir. 2002).

If the plaintiff meets her burden of proving a *prima facie* case, the burden then shifts to the defendant to articulate a legitimate, non-retaliatory, reason for the employment action, and if it carries that burden, the burden then shifts back to the plaintiff to demonstrate by competent evidence that the reasons proffered by the defendant were pretext for retaliatory animus based upon the protected Title VII activity. See Sista v. CDC Ixis North America, Inc., 445 F.3d 161 (2d Cir. 2006).

In the instant case, defendant challenges only the causal connection element of plaintiff's *prima facie* case, and only on the ground that the time between commencement of the Alvarez suit and plaintiff's termination – six months – is too long to infer a causal connection. As many cases have explained, there is no hard and fast rule for the amount of time that must pass before a causal connection is necessarily broken, see Burkybile v. Bd. of Educ. of Hastings-On-Hudson Union Free Sch. Dist., 411 F.3d 306 (2d Cir. 2005), but six months is certainly on the long end. See e.g., Preuss v. Kolmar Labs., Inc., 970 F. Supp. 2d 171, 198 (S.D.N.Y. 2013) ("[D]istrict courts in the Circuit have held that a passage of more than two months between the protected

9

activity and the adverse employment action does not allow for an inference of causation.") (internal quotation marks omitted).

The reason there is no hard and fast rule is that the circumstances vary in every case. Given the *de minimis* burden that plaintiff must demonstrate to make out a *prima facie* case, and the indulgence required in favor of the non-movant on a motion for summary judgment, see Samuels v. Mockry, 77 F.3d 34 (2d Cir. 1996), I cannot find that six months on these particular facts is too attenuated. Commencing a lawsuit is not the same as a discrete act of employee misconduct, like stealing a few cases of soda or assaulting a fellow employee. Termination six months after those kinds of infractions probably would indeed be too long to give to rise to an inference of retaliatory motive. But a big lawsuit like Alvarez looms over a company every day for years, saps its resources, and costs it more than almost any other employee misconduct except an enormous embezzlement. Planning a strategy to remove that employee – especially by a defendant with the human resources resources (pardon the expression) of this defendant, and accompanying knowledge of the exposure to a retaliation claim – was not going to happen overnight.

However, even I give plaintiff the benefit of the doubt and find that she has proven a *prima facie* case, that case entirely collapses at the second and third stage of the McDonnell-Douglas analysis. Although her *prima facie* case allows review of only the evidence that she puts forward, see Graham v. Long Island R.R., 230 F.3d 34 (2d Cir. 2000), defendant's proffered evidence is considered in determining whether it has met its burden of showing a *bona fide* business justification for taking action against her. See Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 108 S. Ct. 2777 (1988). No one could look at plaintiff's disciplinary record and the evidence surrounding the Pimentel incident, including plaintiff's secret recordings, and find an

absence of a *bona fide* business justification for her termination. Defendant had evidence that while on Final Written Warning, plaintiff threatened a fellow employee and then when asked about by management, threatened him again – on a tape recording that she herself made. I need not repeat the background facts set forth above; defendant's showing of a *bona fide* business reason for her termination is evident.

Plaintiff fares no better at the third stage. She has shown nothing upon which a jury could find pretext. First of all, there were sixteen plaintiffs in Alvarez, yet she was the only one to be terminated. Her post-commencement misconduct is the only material differentiating factor in this record between her and her co-plaintiffs. Second, although Arbitrator Herzog's decision of good cause is not dispositive of the claim before me, it is awfully strong evidence that I am permitted to consider on summary judgment. As the Second Circuit held in Collins v. New York City Transit Auth., 305 F.3d 113 (2d Cir. 2002), when a termination occurs "only after a decision, based on substantial evidence, of an undisputedly independent, neutral, and unbiased adjudicator that had the power to prevent the termination," then "[t]his fact is highly probative of the absence of discriminatory intent in the termination." Id. at 119. As the Circuit held:

> Where . . . that decision follows an evidentiary hearing and is based on substantial evidence, the Title VII plaintiff, to survive a motion for summary judgment, must present strong evidence that the decision was wrong as a matter of fact – e.g., new evidence not before the tribunal – or that the impartiality of the proceeding was somehow compromised.

Id. This was the most extensive single-grievant labor arbitration that I have seen. An experienced arbitrator heard abundant live testimony, admitted only a limited amount of hearsay, and rendered a 150-page decision that decisively found that defendant had ample grounds to terminate plaintiff. The same lawyer who is representing plaintiff in the instant case, and who represented her in Alvarez, effectively represented her in the arbitration. Although Arbitrator Herzog did not expressly reject plaintiff's claim that her termination was retaliatory, his strong

11

conclusion of good cause, and the fact that plaintiff raised the same claim of retaliation that she raises here, is entitled to serious consideration on this summary judgment motion.

Yet there is more. Arbitrator Herzog did not comment upon the extensive evidence that defendant produced that plaintiff had numerous other problems with her fellow employees and supervisors. In fact, defendant submitted evidence that plaintiff, on numerous occasions, cursed at working foremen and refused directions which they were authorized to give. She also harassed, hazed, and threatened other workers about various personal and work matters. Finally, as discussed briefly above, plaintiff attempted to bend others to her will by sending a 250-pound friend to confront and intimidate employees she clashed with.

The Arbitrator chose not to delve into these incidents and I will not either. Even though plaintiff disputes these incidents, there comes a point, and it is present in this case, where it does not matter whether a plaintiff or her antagonists at the work site are relaying a story that is closer to the truth. Faced with so many complaints about plaintiff, true or not, defendant was entitled to take them into account when it terminated her based on her Final Written Warning, ungrieved disciplinary history, and the final incident and investigation concerning Pimentel. I do not see how any reasonable jury could find retaliation in light of this mountain of evidence.

Plaintiff's answer to all of this is to advance an unsubstantiated conspiracy theory – that it was defendant that incited all these complaints against her as a result of her participation in Alvarez. The problem is the only factual support she has for this theory is that in the wake of Alvarez, there were some communications between the complaining employees and defendant. But how could there not be? I do not see how defendant could, for example, not talk to Pimentel when he complained about her, in effect telling him that because plaintiff had joined Alvarez, it could not investigate or take action on his complaint.

To support her theory that the employees were "put up" to complaining about her, plaintiff engages in gross distortions of the record. For example, plaintiff argues that defendant organized a group with the purpose of opposing <u>Alvarez</u> and its plaintiffs. However, the record demonstrates that plaintiff draws this conclusion based on the testimony of one individual who states that a few of plaintiff's co-workers expressed displeasure about the lawsuit, and met to discuss it. His testimony neither indicates that defendant called this meeting, nor that there was any type of conspiracy theory targeting the <u>Alvarez</u> plaintiffs. It is one thing to draw every reasonable inference in favor of an opposing party on a motion for summary judgment; it is quite another to engage in rank speculation, which by definition is not making reasonable inferences. Plaintiff would have me do the latter while pretending it is the former. There is no basis for me to do that, and that means there is no basis for a reasonable jury to do it either.

## CONCLUSION

Defendant's motion for summary judgment is granted. The Clerk is directed to enter judgment in favor of defendant, dismissing the complaint.

**SO ORDERED.**

_____
U.S.D.J.

Dated: Brooklyn, New York
June 15, 2015